**SIGNED THIS: June 23, 2022**

_____

**Mary P. Gorman**
**United States Bankruptcy Judge**
_____


UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 18-71012 |
| TRAVIS L. MURPHY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |

---

## O P I N I O N

Before the Court is a Motion to Dismiss Chapter 7 Proceeding filed by the Debtor, Travis L. Murphy. Because the Debtor has not established cause for dismissal but rather has demonstrated a lack of good faith throughout this case and related proceedings such that the Court cannot conclude that the best interest of his creditors would be served, the Debtor's Motion to Dismiss Chapter 7 Proceeding will be denied.

## I.      Factual and Procedural Background

This case was commenced on July 12, 2018, by the filing of the Debtor's voluntary Chapter 7 petition. He had been engaged in the business of farming with his parents, John and Carolyn Murphy, for many years and was a partner in Murphy Farms. John and Carolyn Murphy had filed their own voluntary bankruptcy petition under Chapter 11 just the day prior to their son's Chapter 7 filing.[1] The millions of dollars in liabilities and assets scheduled in each case related almost entirely to the family's farming operation. The primary creditor in both cases was UMB Bank, scheduled as being owed in excess of $8 million secured by the bulk of the estates' assets, including farmland, inventory, crops, equipment, and a grain complex.

Both filings disclosed pending state-court litigation commenced by UMB Bank in which a receiver had been appointed. Shortly after the case filings, UMB Bank filed substantively identical motions in each case to excuse turnover of property under the control of the state-court receiver, alleging the Murphys' gross mismanagement and misconduct and repeated interference with the administration of the receivership. In each case, orders were entered allowing the state-court receiver to remain in possession of estate assets. Also, in both cases, several motions for stay relief and abandonment of property were promptly filed by creditors. In other respects, however, the cases proceeded in significantly different ways.

---

[1] *In re John H. Murphy, Jr., and Carolyn J. Murphy,* Case No. 18-71007.

## A. John and Carolyn Murphy's Bankruptcy Cases

In October 2018, UMB Bank filed an adversary proceeding seeking to deny John and Carolyn Murphy their discharge based on allegations of fraud. The same day, the Murphys' attorney moved to withdraw from representing them citing his and his firm's termination by the clients, fundamental disagreements about how to proceed in the case, and the unreasonable financial burden on the firm if continued representation was required. John Murphy filed correspondence objecting to their attorney's motion to withdraw. At the hearing on the motion at which the Murphys were personally present, the Murphys' attorney asked to put his motion to withdraw on hold and laid out a tentative plan of action under which the Murphys would agree to sell most of their real estate by the end of the year and cease their efforts to regain possession of the assets under the control of the state-court receiver. The Murphys and their attorney were given time to file the necessary documents to put their plan in place. Several motions for stay relief were, however, granted at that time.

Consistent with the course of action outlined at the hearing, the Murphys' attorney filed a motion to sell real estate. UMB Bank also filed a motion for stay relief with the signed consent of interested parties, including the Chapter 7 Trustee in Travis Murphy's bankruptcy case, counsel for the state-court receiver, and counsel for John and Carolyn Murphy. Before the matters could be heard, however, the Murphys' attorney filed notice of his intent to proceed with his motion to withdraw. He then filed motions to

withdraw the sale motion and the Murphys' consent to UMB Bank's stay relief motion. He also filed a motion to dismiss the Chapter 11 case. John and Carolyn Murphy, in turn, filed correspondence stating their objection to the withdrawal of their attorney, noting their need for counsel pending dismissal of the case but also asserting that they did not know what they were agreeing to when they consented to the sale of their real estate and stay relief for UMB Bank.

Notwithstanding the Murphys' objection, their attorney was allowed to withdraw. The Murphy's Chapter 11 case was dismissed with a one-year bar to refiling. UMB Bank's motions for relief from stay were granted in both cases.

John Murphy filed a Chapter 12 petition on August 17, 2020.[2] He was represented in the filing by Attorney William McCleery, who was representing Travis Murphy in this case by that time. The petition, signed by John Murphy and Attorney McCleery represented that Mr. Murphy had obtained the required credit counseling within 180 days before filing but that the certificate had not yet been received. Those representations proved to be false as the certificate later filed by Attorney McCleery showed that the credit counseling was obtained the day after filing. The case was dismissed.

Another Chapter 12 petition was filed by John Murphy on October 1, 2020.[3]  He was again represented by Attorney McCleery. After UMB Bank filed a motion for relief from stay and a motion to dismiss, a stipulated order was entered—signed by Attorney McCleery on behalf of John Murphy—dismissing

---

[2] *In re John H. Murphy, Jr.*, Case No. 20-70919.
[3] *In re John H. Murphy, Jr.*, Case No. 20-71093.

the case with an eighteen-month bar to refiling by agreement. In consideration of the dismissal and bar to refiling, UMB Bank agreed to hold off auctioning the real and personal property of John Murphy until after November 6, 2020. Notwithstanding the bar to refiling, John Murphy filed a third Chapter 12 petition, pro se, on December 1, 2020.[4] This Court enforced the bar to refiling and dismissed the case, sua sponte, within an hour of its filing.

### B. Travis Murphy's Chapter 7 Case

Travis Murphy's Chapter 7 case began on a similar track to that of his parents' Chapter 11 case. As set forth above, UMB Bank sought early on to avoid turnover of estate property by the state-court receiver to the Chapter 7 Trustee, Andrew Erickson, and timely commenced an adversary proceeding to deny the Debtor his discharge based on allegations of fraud. Many of the same creditors that sought stay relief in the Chapter 11 case also sought such relief in this Chapter 7 case. But unlike his parents who were Chapter 11 debtors in possession with the rights, powers, and duties of a trustee, the Debtor in this Chapter 7 case did not share that authority. Trustee Erickson was the party in interest responding to the creditor motions.

Although John and Carolyn Murphy's Chapter 11 case was short-lived, this case has been pending for nearly four years. To a large degree the conclusion of the case has been delayed by the Debtor's—and at times his attorney's—own conduct. A full review of that conduct is not necessary to

---

[4] *In re John H. Murphy, Jr.*, Case No. 20-71278.

resolve the pending Motion to Dismiss; a discussion of several key issues in the case will be sufficient to provide the factual background necessary to decide the matter.

### 1. Failure to Turnover Assets and Comply with Court Orders

Trustee Erickson filed a motion for turnover order on November 27, 2018. The motion sought to compel the Debtor to turn over to him a 2015 Chevrolet Tahoe, a 1999 Freightliner FL 70, a 2011 HL80 Trailer, the Debtor's right to receive non-exempt tax refunds and other payments from the United States government, the Debtor's right to receive any payment through his potential interest in Syngenta class action litigation and settlement, and records relating to the prepetition disposition of assets. The Debtor objected to the motion for turnover, denying the existence of some of the property but essentially arguing that the liquidation value of the assets was not sufficient to justify compelling turnover.

Before the motion for turnover could be heard, the Debtor's initial attorney filed a motion to withdraw asserting that he had been terminated by the Debtor. The motion to withdraw was granted. At a January 2019 hearing on the Trustee's turnover motion, the Debtor, appearing without counsel, asked that the matter be continued for a short time so that he could arrange for legal representation. The request was granted, and the hearing was put over to the end of the month. After two more continuances based on similar

requests by the Debtor, hearing on the Trustee's motion for turnover was finally held February 14, 2019.

Attorney Byron Sims entered his appearance and represented the Debtor at the February hearing. Addressing the Trustee's motion for turnover, Attorney Sims acknowledged the existence of the 2015 Chevrolet Tahoe, 1999 Freightliner FL 70, and 2011 HL80 Trailer, but he noted that the remaining assets identified in the motion were "not currently in the Debtor's possession" and that whatever interest he might have in potential payments or lawsuit proceeds was not known. The Trustee's motion was granted over the Debtor's objection. And on February 20, 2019, an order was entered directing the Debtor to immediately turn over the 2015 Tahoe, 1999 Freightliner, and 2011 Trailer, and to turn over the remaining assets if and when they were received.

Following the hearing, Attorney Sims filed a motion to withdraw, stating that the Debtor had terminated him as his attorney. The motion to withdraw was set for hearing on February 26, 2019. The day before that hearing, the Debtor, acting pro se, filed a motion to continue the hearing, stating that "replacement counsel has been lined up" but would not be able to appear in the case prior to the scheduled hearing. The motion to continue was summarily denied. In the order denying, the Court noted that the Debtor had already been granted several continuances to obtain legal counsel. The February 26 hearing was held as scheduled. Attorney Sims appeared, and his motion to withdraw was granted. The Debtor did not appear.

On September 20, 2019—exactly seven months after the turnover order was entered—the Trustee filed a motion to compel turnover. In it, the Trustee stated that the Debtor had failed to turn over the 2015 Chevrolet Tahoe, 1999 Freightliner, and 2011 Trailer as ordered. The Trustee explained that, after the Debtor initially failed to turn over the property, he engaged with Debtor's latest counsel, William McCleery, to negotiate a resolution of the matters but that the talks were stalled and that the Debtor had been unresponsive. The motion to compel was set for hearing in October.

Prior to the hearing, Attorney McCleery filed a response to the motion to compel on behalf of the Debtor asserting for the first time that the Debtor did not have possession or title to the 1999 Freightliner or the 2011 Trailer because he had transferred the titles to his father, John Murphy, in 2015 and 2013, respectively. He attached to the response documents signed by the Debtor and John and Carolyn Murphy that purported to document the transfers in 2015 and 2013. Also included were copies of the vehicle titles evidencing that the titles were in the Debtor's name but had been endorsed to John Murphy. The response also attempted to justify the failure to turn over the 2015 Chevrolet Tahoe by arguing that there was no equity in it for the Trustee to make any distribution to creditors.

At the October hearing on the motion to compel, the Trustee said that he was considering an offer from the Debtor to pay him the equity value in the Tahoe in lieu of turnover and liquidation. As to the 1999 Freightliner and the 2011 Trailer, the Trustee maintained that the items were property of the

bankruptcy estate, noting that the Debtor listed them as his assets on his petition and had been negotiating over the vehicles for a number of months. The Trustee said that the vehicles remained titled in the Debtor's name and that the Debtor had processed annual registrations in his own name in the years after the date of the purported transfers. The Court questioned Attorney McCleery as to why the prior turnover order was not dispositive of the issues, particularly because the Debtor had never sought relief from that order. The Court explained that a Debtor could not just decide that an order was wrong and not comply with it as Attorney McCleery was suggesting. At the Trustee's request, the motion to compel was set for evidentiary hearing on November 19, 2019.

At the November setting, the parties announced that they had come to a resolution of the Trustee's motion to compel. The Debtor agreed to pay the Trustee $3500 for his interest in the assets. The Court again expressed concern about the Debtor's failure to comply with prior orders but directed the parties to submit an agreed order. The agreed order, signed and submitted by the parties and entered by the Court on November 27, 2019, required the Debtor to pay the Trustee $3500 within 90 days in full satisfaction of the estate's interest in the 2015 Chevrolet Tahoe, the 1999 Freightliner, and the 2011 Trailer.

Within the 90-day window for compliance under the agreed order, the Debtor filed a motion to convert the case from Chapter 7 to Chapter 11 and a signed waiver of discharge. A hearing on those matters was held February 25, 2020, but the Debtor did not personally appear and the matters were reset.

Before the hearing was concluded, however, the Trustee noted that the Debtor was under an agreed order to turn over money that very day and that he had not received those funds. Attorney McCleery simply responded that the day was not over.

When the deadline passed without payment from the Debtor, the Trustee filed a motion for contempt based on the Debtor's failure to comply with the November 2019 agreed order settling the Trustee's motion to compel turnover. A telephonic hearing on the motion for contempt was held on March 24, 2020. Attorney McCleery acknowledged that the Debtor had not complied with the agreed order and that it was not a surprise that he did not have funds to do so. He said, however, that the Debtor wanted to retain the Chevrolet Tahoe and renegotiate a payment to the Trustee to keep that vehicle. He suggested that the Debtor might be able to get some money from John Murphy when his next Social Security check came in to buy the Tahoe from the Trustee. The Debtor offered nothing for the other items he had been ordered to turn over and had agreed to pay for; Attorney McCleery suggested that a hearing would be required to determine whether the Debtor had an interest in those assets.

Both the Trustee and the Court expressed concern that the Debtor had not previously asked the Court to reconsider or vacate its order from February 2019 granting turnover and that, to avoid litigating the issue in November 2019, the Debtor had entered into an agreed order to pay the Trustee the value of the assets. The Court questioned how the Debtor could just decide that he no longer wanted to comply with the agreed order after receiving the benefit of

keeping and using the assets for more than a year. The Court said that it had "had it" with the Debtor's conduct—the Debtor had scheduled the assets, had kept the assets for over a year, had never sought reconsideration of the original turnover order, and had avoided an order compelling turnover by entering into an agreed order to pay $3500. It appeared that the Debtor had entered into the settlement agreement simply to buy time with no prospect or real intent to pay the Trustee as promised.

The Court granted the motion for contempt and entered a money judgment in the amount of $3500 against the Debtor and ordered him to pay that sum within fourteen days. The motion for contempt was reset for telephonic hearing on April 21, 2020, and Attorney McCleery was admonished that if the judgment was not paid by then, fees for the Trustee and a daily monetary sanction would be imposed until the judgment was paid. At the April 21 hearing—a full fourteen months after the entry of the original turnover order—the Trustee reported that the Debtor had paid the money judgment in full.

### 2. UMB Bank's Proceeding to Deny the Debtor's Discharge

UMB Bank timely commenced an adversary proceeding objecting to the Debtor's discharge or, in the alternative, seeking to except to the debt owed to it by the Debtor from any discharge that might be granted. The six-count complaint generally alleged wrongdoing by the Debtor in obtaining an

extension and subsequent renewal of several loans made by UMB Bank to the Debtor and his parents for their farming operations.

More than four months after the complaint had been filed and summons had been served, the Debtor had yet to answer the complaint. On March 12, 2019, UMB Bank filed a motion for default judgment. Prior to the hearing on the motion, Attorney McCleery—then newly retained—filed the Debtor's answer to the complaint. Notwithstanding the filing of the answer, the hearing on the motion for default judgment remained set for March 26, 2019, and was held as scheduled. Neither the Debtor nor Attorney McCleery appeared. Counsel for UMB Bank informed the Court that he had received email correspondence from Attorney McCleery saying that he was out of town and would not be attending the hearing. After expressing surprise that Attorney McCleery would just not show up for the hearing on the motion for default judgment, the Court directed the Clerk to enter a default under Federal Rule of Civil Procedure 55(a) and reset UMB Bank's motion for default judgment for hearing two weeks later. The Debtor then moved to vacate the entry of default, arguing that his attorney's failure to appear was a result of his mistaken belief that the filing of the answer made UMB Bank's motion moot and that the proceeding should be allowed to move forward to a resolution on the merits.[5] The motion to vacate was set with UMB Bank's motion for default judgment.

The hearing was held as scheduled; counsel for both parties appeared. The Court granted the motion to vacate the default but admonished Attorney

---

[5] The motion mistakenly sought to vacate a default judgment, which had not been entered.

McCleery that there had already been numerous extensions of time given to the Debtor in the bankruptcy case and related proceedings and that it expected the proceeding to move along without further delay. The Court entered its standard pretrial order directing the parties to work together on a discovery plan and scheduled a pretrial conference in June 2019.

The June pretrial conference was continued to July at UMB Bank's request based on the parties' ongoing negotiations to resolve the matter. Prior to the continued conference date, UMB Bank unilaterally filed a pretrial statement explaining that it had complied with its initial discovery disclosure requirements and propounded certain discovery requests on the Debtor. The filing also asserted that it had not received reciprocal disclosures or responses to its discovery requests from the Debtor and that it had made several attempts to schedule the Debtor's deposition without success. At the July 2019 pretrial conference, Attorney McCleery acknowledged the Debtor's failures outlined in UMB Bank's pretrial statement but sought to defend those failures based on his belief that matters were going to be resolved prior to the hearing. After explaining that the only way to settle an objection to discharge was to waive discharge or agree to the entry of an order denying the discharge, the Court entered an order requiring the Debtor to file a pretrial statement and provide the required discovery disclosures to UMB Bank within fourteen days. The pretrial conference was reset for the following month.

Prior to the August 2019 continued pretrial conference, the Debtor filed his pretrial statement certifying that he had provided his initial discovery

disclosures and did not intend to conduct any discovery of his own. At the August conference, the parties confirmed that settlement had not been reached and counsel for UMB Bank stated his reluctance to commit to the previously-proposed pretrial schedule. He explained that a scheduled deposition of John Murphy had been postponed indefinitely due to health issues and that attempts to schedule other depositions continued to be unsuccessful. Rather than set a final discovery cutoff, the Court set the matter for further status on November 21, 2019, and admonished the parties that it expected discovery to be substantially completed by then.

Over the next several weeks, UMB Bank filed notices of the issuance of third-party subpoenas for documents and the scheduling of depositions of the Debtor and his parents, as well as a motion to compel responses to written discovery propounded on the Debtor several months earlier. Hearing on the motion to compel was held in October. The Debtor, appearing by Attorney McCleery, did not object to UMB Bank's motion, and an order was entered directing him to respond to past due discovery within fourteen days.

A week before the November case status conference, UMB Bank filed its second motion to compel and for sanctions alleging that the Debtor had still not responded to discovery and had yet to make himself available to be deposed. The motion sought attorney fees and the entry of default judgment against the Debtor or an order barring him from offering evidence in opposition to the allegations of the complaint. The motion was added to the status conference setting. At the hearing, counsel for UMB Bank recited the troubling

history of the case capped by an email received that morning from Attorney McCleery purporting to include the Debtor's long-awaited discovery responses, which were comprised of three documents and cryptic, blanket assertions that UMB Bank already had everything else it was requesting. Attorney McCleery appeared but offered little in the way of excuse or justification. The Court granted UMB Bank partial relief, directing the Debtor to supplement his discovery responses within one week and instructing UMB Bank to proceed with scheduling depositions at its own convenience. The Court reserved ruling on awarding attorney fees and admonished Attorney McCleery that if the Debtor continued to refuse to comply with discovery, his ability to present evidence or otherwise participate at trial might be correspondingly limited.

In February 2020, UMB Bank filed another motion requesting entry of judgment against the Debtor as a sanction for his continued failure to comply with discovery and the Court's orders. At a February 25 hearing on the motion, Attorney McCleery attempted to justify the failures by citing recent settlement negotiations that fell through and noting that the Debtor's recently-filed waiver of discharge pending in the main bankruptcy case would make the issues in the adversary proceeding moot. The Court granted the motion for sanctions, in part, agreeing with UMB Bank that, while waiver and denial of discharge yield the same result, judgment on the adversary complaint would come with certain findings as to wrongdoing that could have significance in other proceedings. UMB Bank was given time to file an affidavit as to the fees it incurred in prosecuting its discovery motions; the issue of whether to grant judgment in

UMB Bank's favor as a sanction was continued for further hearing pending hearing on the Debtor's waiver of discharge.

Due to the COVID-19 pandemic and resulting hiatus of in-person hearings, the hearing on the Debtor's waiver of discharge was continued several times; the waiver was ultimately withdrawn by the Debtor. The Court entered an order on UMB Bank's outstanding motion for sanctions precluding the Debtor from offering evidence in his defense in the adversary proceeding. The Court required UMB Bank to prove up its entitlement to the relief requested and directed UMB Bank to file a motion for summary judgment, which it did on June 5, 2020.

On September 2, 2020, the Court granted UMB Bank's motion for summary judgment and entered judgment against Travis Murphy, denying his discharge. *See UMB Bank v. Murphy (In re Murphy)*, 2020 WL 6066002 (Bankr. C.D. Ill. Sept. 2, 2020).  In a detailed opinion, the Court found that the Debtor had transferred and concealed the transfer of property in the year preceding bankruptcy with the intent to delay, hinder, and defraud his creditors, namely UMB Bank. He falsified documents that he provided to UMB Bank and made false oaths on his bankruptcy papers. After being granted an extension of time to appeal the ruling, the Debtor filed a notice of appeal on September 30, 2020. The Debtor, however, never properly designated a record on appeal, and the appeal was therefore transmitted to the District Court without a full record. Notice of the appeal was docketed with the District Court and a briefing deadline was set, but the Debtor took no action in the appeal for nearly a year.

In early August 2021, a transfer of claim notice was filed in the claims docket of this case, asserting that the claim originally filed by UMB Bank had been transferred to Southport Holdings, LLC. Later that month, another transfer notice was filed, stating that the claim had been transferred from Southport Holdings, LLC to John Murphy and reducing the claim amount by nearly $3 million. Each filing was docketed on behalf of the transferees by Attorney McCleery. No documents detailing the terms of the transfers were attached to any of the filings; the documents showed transfers of the claim but contained no information about any attempted transfer of UMB Bank's position as plaintiff in the objection to discharge proceeding.

On September 23, 2021, the Debtor filed a Stipulation for Disposition of Appeal in the District Court. In it, the Debtor asserted that UMB Bank had transferred its claim against the Debtor to Southport Holdings, LLC and that the claim was thereafter assigned to John Murphy. The stipulation further asserted that the Debtor and his father, as successor in interest to UMB Bank's claim, had come to a resolution of the appeal and agreed that the decision denying the Debtor's discharge should be reversed. The District Court initially dismissed the appeal as settled but then vacated its order and entered another order finding that John Murphy had not been properly substituted as a party to the appeal and, further, that a brief would be required to obtain consideration of a reversal of this Court's order. Attorney McCleery, in turn, filed a motion to substitute John Murphy, claiming that he was the real party in interest as to the matter of the Debtor's discharge. The motion to substitute

is confusing in that it was docketed as filed by Travis Murphy but says on its face that it was being filed by John Murphy. The credentials of Attorney McCleery, who was representing the Debtor in the appeal, were used to file the motion.

After receiving notice of the filings in the District Court, this Court became concerned that the activity occurring there was in violation of fiduciary duties undertaken by UMB Bank when it objected to the Debtor's discharge and that the actions were being taken without notice to the Trustee, the United States Trustee ("UST"), or the Debtor's other creditors. On October 21, 2021, this Court entered an order requesting the UST to investigate and report back on the circumstances of the claim transfers, what measures were in place to protect the interests of the Debtor's creditors, whether UMB Bank's fiduciary obligations were being honored, whether Attorney McCleery could represent both the Debtor and John Murphy in the appeal, and what obligation the Trustee or UST had to intervene or otherwise act.

Thereafter, UMB Bank, the UST, and Trustee Erickson entered appearances in the appeal. The District Court, citing this Court's October 21 order, noted its own concerns and set a February 2022 status conference to explore those issues. In the meantime, UMB Bank filed a motion to dismiss the appeal based on the Debtor's failure to meet required deadlines and prosecute his appeal. Trustee Erickson filed notice of his joinder to UMB Bank's motion. The February hearing was held as scheduled; the docket entry set deadlines for responses to UMB Bank's motion to dismiss.

Following the February hearing before the District Court, the UST filed a motion to correct the record there, specifically as to statements made by Attorney McCleery regarding the transfer of the UMB Bank claim to John Murphy. Throughout the filings in the appeal and the transfer of claim notices in the bankruptcy case, Attorney McCleery represented that John Murphy was the successor in interest to the claim and proper party to the appeal. But, based on the UST's investigation, the documents evidencing the claim transfers—the drafting of which Attorney McCleery was directly involved in—purported to transfer the claim to John Murphy, Carolyn Murphy, and the Debtor. The UST alleged that, when her attorney raised that fact at the February hearing, Attorney McCleery asserted that the UST was wrong and that the claim was transferred solely to John Murphy. Having obtained copies of all the transfer documents and an affidavit from the attorney for Southport Holdings, LLC, the UST sought to correct the record regarding Attorney McCleery's representations. The UST also filed a report in this case regarding the findings of the investigation.

In the District Court, Attorney McCleery filed a motion to strike UMB Bank's motion to dismiss claiming UMB Bank was no longer a party in interest. UMB Bank, in turn, filed a memorandum in opposition to the motion to strike. On March 10, 2022, the District Court issued an opinion and order granting UMB Bank's motion to dismiss and denying all other motions as moot, noting the Debtor's failure to comply with the Bankruptcy Rules and to file the

required appellate brief or anything else in the case for nearly a year. The matter was remanded to this Court for further proceedings.

### 3. The Debtor's Motion to Dismiss and Prior Efforts

On March 3, 2022, prior to the resolution of his appeal from the denial of his discharge, the Debtor filed the Motion to Dismiss his bankruptcy case that is now before this Court. Before discussing the substance of the current Motion to Dismiss, a discussion of the Debtor's prior efforts to obtain similar relief is warranted.

The Debtor's first motion to dismiss his Chapter 7 case was filed on December 13, 2018—after the Trustee began pursuing turnover from the Debtor and UMB Bank commenced the proceeding to deny the Debtor's discharge. The motion merely asserted that the Debtor believed he was better suited to dealing with his creditors outside bankruptcy and that dismissal would be in the best interest of all involved. It was filed by the attorney who had represented the Debtor in the Chapter 7 filing; he asked to withdraw his representation the day after filing the motion to dismiss, citing his termination by the Debtor. Trustee Erickson objected to the Debtor's motion to dismiss, noting the Debtor's prepetition conduct in state-court receivership proceedings and his opposition to turning estate property over to the Trustee, neither of which indicated a willingness to work with and pay his creditors. After several continuances, the motion to dismiss was heard along with the Trustee's motion for turnover on February 14, 2019. The Court agreed with the Trustee that the

Debtor had not established cause for dismissing his Chapter 7 case, and an order was entered denying the motion to dismiss. The Trustee's motion for turnover was also allowed at that time. Following the hearing, the Debtor's second attorney in the case requested and was allowed to withdraw.

On January 29, 2020—after many months of noncompliance with the turnover order, an intervening motion to compel, and an agreed order for payment in lieu of turnover that had yet to be satisfied—the Debtor, through Attorney McCleery, filed a motion to convert the case from Chapter 7 to Chapter 11, asserting an absolute right to do so and nothing more. Two creditors objected to conversion, both similarly arguing that there is no absolute right to such relief and that the Debtor's track record of thwarting creditors and disobeying court orders evidenced his lack of good faith and constituted cause for denying the motion. Prior to the hearing on his motion to convert, the Debtor filed a waiver of discharge signed and dated February 19, 2020. Hearing on the motion to convert, waiver of discharge, and UMB Bank's sanctions motion in the adversary proceeding was held February 25, 2020. The Debtor's waiver of discharge was not taken up due to his absence. The UST and Trustee Erickson voiced their agreement with the filed objections and opposition to conversion. The Court discussed several obstacles to conversion, including questions of good faith, and noted that if the Debtor failed to pay the Trustee by the end of that day as required by the agreed order on the Trustee's motion to compel turnover, it could be dispositive of the issue. Ultimately, the

Debtor was given an opportunity to file an amended motion to convert establishing in more detail his entitlement to the requested relief.

Following the hearing, Trustee Erickson filed a motion for contempt based on the Debtor's failure to comply with the November 2019 agreed order resolving the motion to compel turnover. The Debtor then filed a motion to withdraw his motion to convert, which was allowed. He eventually moved to withdraw his waiver of discharge as well.

The Debtor filed his second motion to dismiss on March 24, 2020—one week after his motion to convert was withdrawn. The motion alleged that the case had been fully administered and sought to turn the tables on the UST, Trustee, and major creditors by arguing that the Debtor's bad faith as alleged by those parties was itself grounds for dismissal. The motion to dismiss proposed that the funds on hand with the Trustee should be used to pay the Trustee's fees and then disbursed 95% to UMB Bank and 5% to Farm Credit Services. The proposed distribution ignored the claims of several other creditors, including the Internal Revenue Service and the Illinois Department of Revenue. After Attorney McCleery failed to serve his motion and file a proof of service despite receiving two notices to do so, the motion to dismiss was stricken.

The Debtor's current Motion to Dismiss his Chapter 7 case was filed shortly before the District Court entered judgment against him and dismissed his appeal. In it, the Debtor contends that the only valid, general unsecured claim remaining belongs to John Murphy, who supports dismissal of his son's

Chapter 7 case. The Motion to Dismiss acknowledges priority tax claims held by the Illinois Department of Revenue and Internal Revenue Service and the Trustee's entitlement to compensation, all of which he proposes to pay from Attorney McCleery's trust account into which estate funds would be deposited upon dismissal. As part of the proposal, John Murphy would give up a portion of the dividend that would otherwise be due to him, making more funds available for other creditors than administration by the Trustee would yield. The Motion also argues that the proposed dismissal would be in the interest of judicial economy and save other time and resources because the Debtor's appeal from the order denying his discharge, the UST's investigation into claim transfers, and the Trustee's pending adversary proceeding against Carolyn Murphy would all become moot.[6] Finally, the Motion to Dismiss asks that the Court "vacate, expunge, or otherwise amend [the] Debtor's filing to limit public access thereto so as to prevent the dissemination of information that would otherwise damage his ability to obtain credit or employment so that he can move on with his life." In consideration for such relief, the Debtor would agree not to file another Chapter 7 case during his lifetime.

The UST filed an objection to the Motion to Dismiss, noting that the Debtor's appeal from the UMB Bank proceeding had since been dismissed,

---

[6] The Trustee filed a preference action against Carolyn Murphy seeking to avoid and recover an $11,000 transfer made by the Debtor shortly before filing. (*Erickson v. Murphy,* Adv. No. 20-07033). Attorney McCleery appeared and answered for Carolyn Murphy, raising an affirmative defense that the transfer was made in the ordinary course of business. After multiple failures to comply with discovery and produce any evidence regarding the defense, Carolyn Murphy was sanctioned and barred from presenting evidence at trial. She then settled with the Trustee for $5000, but, after the Trustee obtained approval for the compromise, Carolyn Murphy refused to pay because John Murphy by then held the largest claim and would receive most of the funds. The compromise has now been vacated and the matter remains pending.

making the denial of the Debtor's discharge a final, nonappealable order. Citing the Debtor's conduct before and throughout the Chapter 7 case and related proceedings and the fact that the Debtor had enjoyed the benefit of the automatic stay for more than three years while interested parties expended enormous effort working toward the case's conclusion, the UST argues that the circumstances weigh heavily against dismissal. Allowing the Debtor to voluntarily dismiss his case now would only condone his conduct and further his abuse of the bankruptcy system. In any event, the UST contends, the order denying the Debtor's discharge should remain in effect and the Debtor's request for expungement is not supported by statutory or case law. Trustee Erickson also filed an objection adopting the reasoning set forth in the UST's objection and taking issue with the Debtor's suggestion that the premature end of unresolved matters rendered moot by dismissal would be in the best interest of creditors.

Attorney McCleery filed the Debtor's response to the Trustees' objections, reprising the argument that if his client engaged in misconduct as alleged, then it establishes the necessary cause for dismissal. He suggests that the case is being kept alive only to punish the Debtor and that the UST's stated concerns about relying on any promise or agreement from the Debtor are merely attempts to smear the integrity and trustworthiness of the Debtor and his attorney.

After the objection and response deadlines passed, the matter was taken under advisement. Having considered the arguments of interested parties, the matter is ready for decision.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). A motion to dismiss a bankruptcy case is a core proceeding. 28 U.S.C. §157(b)(2)(A). This matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

## III.    Legal Analysis

### A. Authority for Dismissal Under § 707(a)

A Chapter 7 case—even if filed voluntarily—can only be dismissed for "cause" under §707(a). *See* 11 U.S.C. §707(a); *In re Hopper*, 404 B.R. 302, 306 (Bankr. N.D. Ill. 2009) (citation omitted). Even though the statute does not specifically refer to the debtor as the movant, the requirement of "cause" under §707(a) has long been construed to apply to such motions. *Id.* (citations omitted); *In re Smith*, 507 F.3d 64, 72 (2d Cir. 2007). As such, debtors do not have an absolute right to voluntarily dismiss their bankruptcy cases. *Hopper*,

404 B.R. at 306 (citations omitted). Like any other movant, a debtor seeking voluntary dismissal of his Chapter 7 case has the burden of showing that cause exists for the relief sought. *Id.* at 307 (citations omitted); *see also In re Brooks*, 2010 WL 148641, at *1 (Bankr. C.D. Ill. Jan. 13, 2010). Whether to allow voluntary dismissal is left to the sound discretion of the bankruptcy court, however, and the court may deny the motion—even upon cause shown— if prejudice to creditors or other factors weigh against dismissal. *In re Zimmer*, 623 B.R. 151, 161-62 (Bankr. W.D. Pa. 2020) (citations omitted); *Hopper*, 404 B.R. at 307-08.

Section 707(a) sets forth three illustrative rather than exhaustive examples of cause: unreasonable delay by the debtor, nonpayment of certain fees, and, upon motion by the UST, the failure of the debtor to timely file certain required documents. 11 U.S.C. §707(a)(1)-(3); *Hopper*, 404 B.R. at 307 (citations omitted). But courts consider an array of factors, guided by "the totality of the circumstances." *Hopper*, 404 B.R. at 307-08. General considerations include: "(1) whether dismissal is in the best interest of the debtor; (2) whether dismissal is in the best interest of the creditors; (3) whether dismissal would result in an abuse or manipulation of the system; and (4) whether dismissal is justified by compelling equitable principles." *Id.* at 308 (citations omitted). Additional factors that courts have specifically considered when ruling on a debtor's motion to dismiss include:

> (1) whether all creditors have consented; (2) whether the debtor is acting in good faith; (3) whether the dismissal would result in a prejudicial delay in payment; (4) whether

> dismissal would result in a reordering of priorities; (5)
> whether there is another proceeding through which the
> payment of claims can be handled; and (6) whether an
> objection to discharge, an objection to exemptions, or a
> preference claim is pending.

*Id.* (citation omitted).

Still, no list of factors is exhaustive, and courts may consider any number of other factors that instruct whether dismissal is in the best interest of all parties in interest, giving primary consideration to the interest of creditors. *Id.* at 307-08 (citations omitted); *Smith*, 507 F.3d at 72 (citations omitted). The best interest of the debtor "lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses leaving him with resources to work out his debts." *In re Watkins*, 229 B.R. 907, 909 (Bankr. N.D. Ill. 1999) (quoting *In re Schwartz*, 58 B.R. 923, 925-26 (Bankr. S.D.N.Y. 1986)). The interest of creditors, however, is typically a question of prejudice,

> and if delay is said to have prejudiced them, whether, as
> §707 provides, the delay has been unreasonable. They are
> generally not prejudiced by dismissal since they will no
> longer be stayed from resorting to the state courts to enforce
> and realize upon their claims. But creditors can be
> prejudiced if the motion to dismiss is brought after the
> passage of a considerable amount of time and they have
> been forestalled from collecting the amounts owed to them. A
> prejudicial delay also creates the appearance that such an
> abusive practice is implicitly condoned by the Code.

*Id.* "When dismissal will only allow the Debtor to hinder creditors, secret assets, and further the Debtor's abuse of the system, dismissal of [his] voluntary petition is not warranted." *In re Simmons*, 200 F.3d 738, 743 (11th

Cir. 2000) (reversing district court reversal of bankruptcy court denial of voluntary dismissal).

In examining whether cause exists for dismissal, the effect of dismissal on the debtor, creditors, trustees, and other parties in interest must be considered. A dismissal generally "does not bar the discharge, in a later case . . . of debts that were dischargeable in the case dismissed[.]" 11 U.S.C. §349(a). But a dismissal does not result in the automatic vacation of an order denying a discharge; debts not dischargeable in a case because discharge was denied do not become dischargeable upon dismissal. And, importantly, a court may order, as condition of a dismissal, that debts owed at the time of filing cannot be discharged in future cases, effectively denying a debtor a discharge even when no adversary complaint has been prosecuted in the case. *See, e.g.*, *In re Smith*, 2004 WL 3623503, at *6 (Bankr. D. Utah Nov. 19, 2004) (relying on 11 U.S.C. §349(a)).

Although dismissal does not result in the vacation of an order denying a debtor's discharge, it does result, unless specifically ordered otherwise, in the reinstatement of various avoided transfers and the vacation of orders entered to preserve those avoided transfers for the benefit of the estate. 11 U.S.C. §349(b). Specifically, transfers avoided as preferential or fraudulent or by the use of a trustee's strong-arm powers are reinstated, and orders entered allowing recovery of those transfers are vacated. 11 U.S.C. §349(b)(1)(B), (2). Generally, the result of a dismissal is that property revests in the entity owning the property before the commencement of the case. 11 U.S.C. §349(b)(3).

*B. The Debtor's Motion to Dismiss*

In this case, numerous considerations weigh against voluntary dismissal. The Debtor has a long, well-documented history of evading and hindering his creditors and the Trustee. This case was filed in an effort to terminate the state-court receivership put in place to preserve and collect assets for the benefit of creditors. Throughout the case, the Debtor regularly engaged in behavior to delay and hinder its administration. Initially, delays came in the form of repeated requests for extensions and continuances after successively firing several attorneys retained to represent him. Those tactics continued even after retaining his current counsel, Attorney McCleery. As the case progressed, the Debtor's behavior became increasingly egregious; he refused to comply with court orders and went back on and tried to renegotiate settlement agreements long after his payment obligations had come due. The misconduct also spread to the adversary proceeding commenced by UMB Bank to deny the Debtor's discharge in which he refused to comply with his discovery obligations and several related court orders. His discharge was ultimately denied based on proof of similar prepetition efforts to defraud his creditors and false oaths he made in the bankruptcy case. On appeal from the order denying the Debtor's discharge, the matter sat dormant in the District Court for almost a year while he and Attorney McCleery orchestrated a series of claim transfers through which UMB Bank's claim was assigned to the Debtor and his parents before the Debtor and his father tried to circumvent this Court's ruling by filing—

again through Attorney McCleery—a joint stipulation to vacate the denial of the Debtor's discharge.

The Debtor contends that dismissal is in his creditors' best interest because, according to his proposed distribution calculations, creditors would be paid a higher dividend more quickly than through the Trustee's administration of the estate. He complains of the amount of time the case has been pending and about what he sees as the UST's unwarranted mistrust of him and his attorney. But the amount of time the Debtor's case has remained open is a direct result of his own conduct and undercuts rather than supports his case for dismissal.

As a preliminary matter, the UST raises practical concerns about whether the Debtor can be trusted to do what he says he will or will not do. Time and again, the Debtor has made promises to obtain favorable relief or avoid unwanted outcomes in furtherance of his own interests only to not follow through on his end of the bargain. For his part, Attorney McCleery has facilitated the Debtor's conduct, advocating inconsistent factual and legal positions when it served his client's efforts to avoid his obligations in the case and related proceedings. To be blunt, the Court shares the UST's concerns about relying on any promise of the Debtor or Attorney McCleery.[7] In any event, as is explained below, dismissal is not in the best interest of creditors notwithstanding the Debtor's proposal.

---

[7] The Debtor attempts to bolster the credibility of his promises about his proposed distribution of the estate funds by having his father sign off on the Motion to Dismiss and commit to the plan. But John Murphy's track record for credibility before this Court is equally suspect. He promised not to refile and accepted a bar to refiling when his second Chapter 12 case was dismissed. Less than two months later, he filed another case.

The Motion to Dismiss appears to be based, at least in part, on faulty assumptions by Attorney McCleery about the effect of dismissal. He included a promise that the Debtor would never file another Chapter 7 bankruptcy, seeming to believe that the dismissal would vacate the order denying the Debtor's discharge. The promise of never refiling makes no sense and would make no difference to any current party in interest if the Debtor leaves this case—as he will—with his discharge denied. More important to the best interest of creditors test, however, is the failure of the Debtor and Attorney McCleery to consider what impact dismissal could have on other matters resolved during the pendency of the case.

In the Motion to Dismiss, the Debtor recites that the Trustee has collected $76,687, has distributed $12,430, and has a balance on hand of $64,257. The Debtor's suggestion that creditors will benefit from dismissal is based on a distribution of the remaining funds as shown on an exhibit to the Motion to Dismiss. But overlooked in the calculation is the fact that $35,000 of the funds collected by the Trustee came from the settlement of an action brought against HomeBank using the Trustee's strong-arm powers to avoid a mortgage lien.[8] *See* 11 U.S.C. §544. If the case were dismissed, HomeBank would have a claim that the $35,000 it paid to the Trustee in settlement of the avoidance action should be refunded to it, causing a reduction by more than half of the funds available to pay creditors. *See* 11 U.S.C. §349(b). Of course, this Court, for cause, could order otherwise and decline any such request from

---

[8] *Erickson v. HomeBank*, Adv. No. 18-07054.

HomeBank. But the Debtor has not asked the Court to order otherwise, and the likelihood that the Court would allow the Debtor to dismiss and avoid all the consequences of filing bankruptcy yet hold HomeBank to the consequences of the filing seems remote. And at the very least, dismissal would require further litigation of issues that would otherwise not exist or were previously disposed of—a result clearly at odds with the Debtor's assertion that his proposal would be more efficient than simply letting the Trustee complete his administration of the case.

One key benefit that Chapter 7 provides creditors is the assurance of an equitable distribution of a debtor's nonexempt assets by a trustee under the supervision of the bankruptcy court. Without the assurance provided by the bankruptcy process after having been subjected thereto, creditors bear the risk of not being paid and are necessarily prejudiced to some degree. *Hopper*, 404 B.R. at 310. "The Debtor's vow to pay [his] creditors in the future does not dispel such prejudice." *Id.* at 311. Rather, the inherent prejudice of leaving creditors to fend for themselves outside bankruptcy is compounded in this case by the amount of time that has elapsed. Dismissing the Debtor's case now would make for prejudicial delay to creditors. *See Watkins*, 229 B.R. at 909. As the court in *Watkins* noted, while dismissal generally frees creditors of the strictures of bankruptcy and allows them to pursue state-court collection remedies, the option becomes increasingly prejudicial with the passage of time during which a debtor has enjoyed the protections and benefits of the

automatic stay and his creditors have been forestalled from enforcing their rights. *Watkins*, 229 B.R. at 909.

This Chapter 7 case was filed in a clear attempt to forestall creditors and has been pending for nearly four years. Setting aside the fact that the Debtor is mostly responsible for the delay, simply too much time has passed for the Court to find that dismissal could be in the best interest of the Debtor's creditors. And, because the Debtor's calculations of what creditors might receive upon dismissal do not take into account the $35,000 of funds on hand that would likely be refunded to HomeBank, no credible argument can be made that there is any benefit at all to creditors from dismissal.

To dismiss the Debtor's case at this point, after many years have passed and he has been denied his discharge, would also be to condone his abuse and manipulation of the bankruptcy system. *See In re Sgambati*, 584 B.R. 865, 885-86 (Bankr. E.D. Wis. 2018) (debtor's motion to voluntarily dismiss case denied for same reasons he was denied his discharge); *Hopper*, 404 B.R. at 308; *Simmons*, 200 F.3d at 743; *Watkins*, 229 B.R. at 909 (prejudicial delay creates the appearance that such an abusive practice is implicitly condoned by the Code). Through his conduct before and throughout his bankruptcy case, the Debtor has repeatedly demonstrated that he has no interest in dealing honestly and fairly with his creditors, the state-court receiver, or Trustee Erickson. Rather, he has shown a penchant for frustrating his creditors' collection efforts and the Trustee's administration of the case. Indeed, his discharge was denied on similar grounds. To permit the Debtor's latest effort to

Case 18-71012    Doc 377    Filed 06/23/22    Entered 06/23/22 16:33:31    Desc Main
Document    Page 34 of 38

avoid the ramifications of having sought bankruptcy relief would undoubtedly be to condone his abuse and manipulation of the system and open the door to further misconduct. *See Hopper*, 404 B.R. at 308; *Simmons*, 200 F.3d at 743 (history of abuse warranted denial of debtor's motion to dismiss which would otherwise create an opportunity for further abuses); *Watkins*, 229 B.R. at 909.[9]

Ultimately, the Debtor failed to establish cause for dismissing his long-pending Chapter 7 case, and his motion could be denied on that basis alone. *See Hopper*, 404 B.R. at 307-09 (debtor's asserted ability to pay outside bankruptcy not enough to establish cause for dismissal). But even had he been able to show cause, denial of the motion to dismiss is warranted based on the Debtor's own history of abuse and the resulting prejudice to creditors. *See Brooks*, 2010 WL 148641, at *1 (intent to settle debts outside bankruptcy outweighed by potential prejudice to creditors); *Hopper*, 404 B.R. at 307-09; *Simmons*, 200 F.3d at 743. For these reasons, the Debtor's Motion to Dismiss Chapter 7 Proceeding will be denied.

### C. Expungement of Bankruptcy Case Filing

Although the Debtor's Motion to Dismiss will be denied for the reasons set forth above, a related request included in the motion must be briefly

---

[9] The Debtor, through Attorney McCleery, also makes the somewhat novel argument that his bad faith and the unreasonable delay caused by him meet the express statutory standards for cause and therefore warrant dismissal. The argument turns the language of §707 on its head and is easily dispelled. A debtor's regret over the decision to voluntarily submit himself to the jurisdiction of the bankruptcy court is not a basis for dismissal. *Hopper*, 404 B.R. at 309 (citation omitted). Rewarding misconduct with dismissal at a debtor's request would create a perverse incentive for any debtor with a change of heart at any point to sabotage the administration of their bankruptcy case. And "[w]hen dismissal will only allow the Debtor to hinder creditors, secret assets, and further the Debtor's abuse of the system, dismissal of [his] voluntary petition is not warranted." *Simmons*, 200 F.3d at 743.

addressed. As part of his request for dismissal, the Debtor asks that his bankruptcy filing be vacated, expunged, or otherwise amended to "limit public access thereto so as to prevent the dissemination of information that would otherwise damage his ability to obtain credit or employment so that he can move on with his life." In exchange for such relief, the Debtor offers his promise "not to file another Chapter 7 bankruptcy case during his lifetime." He cites §107(b) and a Pennsylvania bankruptcy decision relying on §105 and the implied equitable powers of bankruptcy courts as authority for expunging or limiting access to bankruptcy filings. *See* 11 U.S.C. §§105, 107; *In re Buppelmann*, 269 B.R. 341 (Bankr. M.D. Pa. 2001). The Debtor's request is wholly without merit.

Section 107 provides for public access of bankruptcy case dockets and papers filed therein with certain exceptions. 11 U.S.C. §107(a). Access may, and in some instances must, be limited to protect trade secrets or other confidential commercial information, to protect against scandalous or defamatory matters, or to prevent the disclosure of certain identifying information that would create an undue risk of identity theft or other unlawful injury. 11 U.S.C. §107(b), (c)(1). There is a strong presumption favoring public access, however, and courts therefore narrowly construe exceptions thereto. *See In re Comdisco, Inc.*, 2006 WL 2375458, at *4 (N.D. Ill. Aug. 14, 2006); *In re FiberMark, Inc.*, 330 B.R. 480, 505-06 (Bankr. D. Vt. 2005) (all documents filed in bankruptcy cases should be available to the public absent compelling circumstances) (citations omitted).

The Debtor does not explain how the exceptions to public access described in §107 pertain to his bankruptcy filing or any specific paper filed therein beyond his vague assertion that the stigma or repercussions of seeking bankruptcy relief will impact his ability to obtain credit or employment and move on with his life. But the mere existence of records evidencing his bankruptcy filing, the disposition of matters therein, and the consequences thereof, without more, is insufficient to justify limiting the public's right to informational access. *See In re Chapman*, 2021 WL 1346046, at *7-9 (Bankr. E.D. Wis. Mar. 26, 2021) (dissemination of truthful matter cannot be enjoined merely because it is prejudicial); *In re Laws*, 223 B.R. 714, 715 (Bankr. D. Neb. 1998) ("The need of the public to know of the filing of the bankruptcy case . . . outweighs the debtors' desire to avoid the embarrassment and difficulties attendant to the filing of bankruptcy.").

The Debtor also contends that this Court has the inherent power under §105 to expunge his bankruptcy records; he cites *Buppelmann* for the proposition. The *Buppelmann* decision, recognizing that "expungement is an extraordinary remedy only utilized in the rarest of circumstances[,]" identified two such circumstances in which a bankruptcy court might exercise its equitable powers under §105 to expunge a bankruptcy case: when the case is filed in error or by means of fraud on the part of someone other than the debtor. *Buppelmann*, 269 B.R. at 341-42. But the rare circumstances contemplated in *Buppelmann* do not exist here; the Debtor knowingly filed his voluntary Chapter 7 petition and cannot now avoid the consequences thereof

-36-

through expungement. *See In re Henry*, 2019 WL 623873, at *2 (Bankr. S.D. Tex. Feb. 12, 2019).

Further, the *Chapman* decision instructs that the reasoning of *Buppelmann* is incompatible with Seventh Circuit precedent. *Chapman*, 2021 WL 1346046, at *5-6 (analyzing *U.S. v. Wahi*, 850 F.3d 296 (7th Cir. 2017)). In *Wahi*, the Seventh Circuit held that district courts do not have the inherent equitable power to order expungement of judicial records and overruled its prior precedent to the contrary. *Wahi*, 850 F.3d at 302-03. Relying on *Wahi* and applying the same reasoning in the context of bankruptcy, *Chapman* held that the "inherent equitable power" of bankruptcy courts under §105(a) "is an insufficient basis, standing alone, to confer jurisdiction to expunge" a bankruptcy case. *Chapman*, 2021 WL 1346046, at *5-7. Against this backdrop, the Court concludes that the Debtor has not provided any basis upon which it could, let alone should, expunge or otherwise limit public access to his bankruptcy filing.

## IV.   Conclusion

The Debtor has sought to delay and hinder his creditors and the administration of his bankruptcy case at practically every turn. Now that his conduct has caught up with him and he has lost the benefit of having his debts discharged, he apparently regrets the decision to file for bankruptcy relief and wants out. But the Debtor not only wants out; he also wants to take all of the funds that the Trustee has collected with him. He justifies that request with a

promise to pay those funds to creditors and to never file another bankruptcy but then asks that any record of his promises be expunged or sealed.

Dismissal of this case now under the circumstances before the Court is the exact outcome that the law counsels against. The abuse and manipulation of the bankruptcy process that has occurred and would undoubtedly be furthered by rewarding the Debtor's conduct with dismissal cannot be condoned. With the motion to dismiss being denied, the Trustee will work to complete his administration of the Debtor's estate. The case will be concluded in due time, and the Debtor, having been denied his discharge, will be able to deal with his creditors on his own as he claims he wants to do.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

### ###